**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE HUMANE SOCIETY                    )
OF THE UNITED STATES                  )
2100 L Street, NW                     )
Washington, DC 20037,                 )
                                      )       Civ. No. 12-1965
THE FUND FOR ANIMALS                  )
200 West 57th Street                  )
New York, NY 10019,                   )
                                      )
                                      )
                                      )       **Complaint for Declaratory and**
                                      )       **Injunctive Relief**
                                      )
            Plaintiffs,               )
                                      )
      v.                              )
                                      )
U.S. FISH AND WILDLIFE SERVICE        )
1849 C Street, N.W.                   )
Washington, D.C. 20240                )
                                      )
KENNETH SALAZAR,                      )
*in his official capacity as*,        )
Secretary of the Interior             )
U.S. Department of Interior           )
1849 C Street, N.W.                   )
Washington, D.C. 20240                )
                                      )
DANIEL ASHE,                          )
*in his official capacity as*,        )
Director                              )
U.S. Fish and Wildlife Service        )
1849 C Street, N.W.                   )
Washington, D.C. 20240                )
                                      )
            Defendants.               )

## INTRODUCTION

1.      Plaintiffs, animal protection and conservation organizations, challenge the decision of the U.S. Fish and Wildlife Service ("FWS") to eliminate the protections of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.*, from gray wolves in Wyoming.  77 Fed. Reg. 55,530 (Sept. 10, 2012) ("Delisting Rule").

2.      Gray wolves were once abundant across North America, with more than 350,000 individuals inhabiting the American West.  However, with the European Settlers came the widespread persecution of wolves.  According to the FWS, "wolves were hunted and killed with more passion and zeal than any other animal in U.S. history."  FWS, *Gray Wolf*, http://digitalmedia.fws.gov/cdm/ref/collection/document/id/111 (July 1998).  Habitat destruction and government bounties that encouraged the poisoning, trapping, and hunting of wolves resulted in their extirpation from nearly all of their range in the contiguous United States.

3.      Due to its significant imperilment, the gray wolf was one of the first species listed as endangered when Congress enacted the ESA in 1973.  With the protections of the ESA, the gray wolf was shielded from the unrestrained killing that drove the species to the brink of extinction and began a slow progression towards recovery.  Yet even today, the gray wolf is present across just five percent of its historic range.

4.      Despite the gray wolf's continuing endangerment, the FWS has pursued a determined campaign to remove the gray wolf from the federal list of endangered species throughout all or a portion of the Northern Rocky Mountain region.  After various federal courts overturned each prior attempt as violative of the ESA, Congress removed wolves in most of the Northern Rocky Mountains from the list of endangered species in 2011 via an appropriations

rider, H.R. 1473, Pub. L. 112-10 § 1713 (2011).  However, Congress chose not to delist wolves in Wyoming.

5.      Following the Congressional rider, Secretary Salazar met with the Wyoming governor to create a wolf delisting plan for the state and discuss the substance of the state's wolf management plan.  The Wyoming Fish and Wildlife Commission subsequently adopted a wolf management plan in September 2011.  On October 5, 2011, the FWS issued a proposed rule to delist wolves in Wyoming based on that plan.  76 Fed. Reg. 61,782 (Oct. 5, 2011).

6.      The hostility towards wolves embodied in Wyoming's approved wolf management scheme is reminiscent of a time when bounties paid by state and federal governments encouraged the widespread killing of wolves that nearly wiped out the entire species from the lower 48 states.  Such hostility, in combination with Montana and Idaho's aggressive management plans, threatens the wolf's continued survival and inhibits wolves in the Northern Rocky Mountains from achieving true recovery.

7.      Indeed, over 50 wolves – approximately 15 percent of the estimated wolf population in the entire State of Wyoming  –  have already been killed in the first two months of the state's first hunting season for wolves in over three decades.

8.      Wyoming's current scheme suffers from many of the same inadequacies that led to the FWS's repeated rejection of prior iterations as insufficiently protective of wolves. Nevertheless, on September 10, 2012, the FWS published a final decision eliminating ESA protections for the Wyoming portion of the Northern Rocky Mountain gray wolf population.  77 Fed. Reg. at 55,530.

9.      In addition, the FWS failed to conduct the proper delisting analysis by focusing its threats analysis on wolves in Wyoming only, rather than on threats to the entire Northern Rocky

Mountain distinct population segment, and by failing to analyze threats throughout a significant portion of the wolf's range; and failed to comply with the ESA's mandate that delisting decisions be based solely on the best available science.

10.     Accordingly, the delisting rule is arbitrary, capricious, and otherwise not in accordance with the ESA, and must be set aside.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. §§ 702, 704.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under United States law.   It may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.

12.     Venue is proper in this District because one or more plaintiffs reside in the District of Columbia and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  *See* 28 U.S.C. § 1391(e); 16 U.S.C. § 1540(g)(3)(A).

## PARTIES

13.     Plaintiff The Humane Society of the United States ("The HSUS") is a non-profit charitable organization incorporated in 1954.   The HSUS is the largest animal protection organization in the world, with over 11 million members and supporters.   Its mission is to promote the humane treatment of animals and to foster respect, understanding, and compassion for all creatures.   The HSUS has shown particular interest in endangered species, and supports efforts aimed at the protection and recovery of such species and their habitats.   The HSUS has long been an active advocate for wolf protection and recovery.   Its members enjoy studying,

photographing, and viewing wildlife in their natural habitat, including wolves, and some of these members have attended meetings on wolf management held by state and federal agencies and other interested parties.  The HSUS and its members regularly submit comments to governmental agencies on issues affecting animals, including wolves.

14.     Plaintiff The Fund for Animals ("the Fund") is a national nonprofit membership organization headquartered in New York City, with a campaign office in Silver Spring, Maryland, and with over nine regional offices and various animal sanctuaries located throughout the country.   The Fund and its over 350,000 members and supporters are committed to preserving animal and plant species in their natural habitats, and preventing the abuse and exploitation of wild and domestic animals.

15.     The Plaintiff organizations and their members are deeply committed to wolves and have long-standing interests in the preservation and recovery of wolves in Wyoming and the Northern Rocky Mountains.  Plaintiffs place a high value on wolves as a species and because gray wolves play a vital role in the maintenance of healthy ecosystems in the region.  Plaintiffs seek to protect and recovery gray wolves through a wide variety of actions including public education and advocacy.  Members of the Plaintiff groups seek to view wolves and signs of wolves in the wild throughout Wyoming and the Northern Rocky Mountains.  Implementation of the Delisting Rule will result in fewer wolves within the region and will reduce the members' opportunities to experience wolves, and will cause harm to the ecosystems throughout the Northern Rocky Mountains.

16.     Because the Delisting Rule will reduce Plaintiffs' opportunities to experience wolves and the habitats upon which they depend, the legal violations alleged in this Complaint cause direct injury to the aesthetic, conservation, recreational, scientific, educational, and

wildlife preservation interests of the Plaintiff organizations and their members.   Plaintiffs'
aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests
have been, are being, and, unless their requested relief is granted, will continue to be adversely
and irreparably injured by the FWS's failure to comply with federal law.   These are actual,
concrete injuries, traceable to the FWS's conduct that would be redressed by the requested relief.
Plaintiffs have no adequate remedy at law.

17.     Defendant U.S. Fish and Wildlife Service ("FWS") is the federal agency within
the Department of Interior to which the Secretary of the Interior has delegated the authority to
conserve and manage most endangered and threatened terrestrial species pursuant to the ESA,
including the gray wolf.   The FWS is responsible for administering the ESA with respect to
terrestrial wildlife including gray wolves.

18.     Defendant Dan Ashe is the Director of the FWS and has responsibility for
implementing and fulfilling the agency's duties under the ESA and APA.   Director Ashe is sued
in his official capacity.

19.     Defendant Ken Salazar is the U.S. Secretary of the Interior and has ultimate
responsibility over the FWS.   Secretary Salazar is sued in his official capacity.

## STATUTORY BACKGROUND

### *The Endangered Species Act*

20.     In enacting the ESA, Congress recognized that certain species "have been so
depleted in numbers that they are in danger of or threatened with extinction."   16 U.S.C. §
1531(a)(2).   Accordingly, the purpose of the ESA is "to provide a means whereby the
ecosystems upon which endangered species and threatened species depend may be conserved,
[and] to provide a program for the conservation of such . . . species."   *Id*. § 1531(b).

21.     Under the ESA, the Secretary of Interior, acting through the FWS, must list all species determined to be "endangered species" and "threatened species" pursuant to Section 4 of the ESA.  16 U.S.C. § 1533.

22.     A species is "endangered" if it is "in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id*. § 1532(20).

23.     The "significant portion" of the range (as used in the definition of "endangered species" and "threatened species") includes major geographical areas where the species was once present, regardless of whether the species currently exists in those areas.  *Defenders of Wildlife v. Norton*, 239 F.Supp. 2d 9, 20 (D.D.C. 2002).

24.     The term "species" is defined to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16).

25.     Under Section 4 of the ESA, the FWS must list a species if the agency determines that the species is endangered or threatened due to any of the following factors:

>    (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
>
>    (B) overutilization for commercial, recreational, scientific, or educational purposes;
>
>    (C) disease or predation;
>
>    (D) the inadequacy of existing regulatory mechanisms; or
>
>    (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).

26.     Once listed as "endangered" or "threatened", a species receives the substantial protections of the ESA, and can only be delisted if the species is neither endangered nor threatened because it is extinct, because it has recovered, or because the original listing decision was in error.  *See* 50 C.F.R. § 424.11(d).

27.     Decisions to delist or reclassify an already-listed species are governed by the same five factor analysis as when listing a species. A species has not recovered, and cannot be delisted, "until the threats to the species as analyzed under section 4(a)(1) of the Act have been removed."  51 Fed. Reg. 19,926, 19,935 (June 3, 1986).  For example, because a species can be listed solely on the basis of "the inadequacy of existing regulatory mechanisms," 16 U.S.C. § 1533(a)(1)(D), a species cannot be listed unless and until adequate regulatory mechanisms exist to protect the species and ensure its long-term conservation after federal protections are removed.

28.     All listing decisions under the ESA – whether to list, reclassify, or delist – must be based "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(c)(2)(B), (b)(1)(A); *see also* 50 C.F.R. § 424.11(b), (d).

### The Administrative Procedure Act

29.     The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  *Id.* § 704.

30.     In applying the APA to a final agency action, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

### *Gray Wolf Biology*

31.     The gray wolf (*Canis lupus*) is the largest wild member of the dog family (*Canidae*).   Wolves prey primarily on wild ungulates such as deer, elk, and moose, as well as smaller mammals like beaver and rabbits.   Wolves are habitat generalists, and if they are not persecuted by humans, can live anywhere that contains a sufficient population of ungulates.

32.     Wolves are also social animals, and wolf pups are dependent upon family units, or packs, for their survival.   The pack itself usually consists of a dominant pair, their pups, and several other subordinate or young animals.   The dominant, alpha pair leads the pack in hunting, finding den sites, and establishing the pack's territory.   Scientific studies indicate that if an alpha wolf is removed from a pack, the probability that the pack will successfully breed the following year is approximately halved.   When both alpha wolves are killed, the short-term reproductive potential of the pack is generally destroyed.   This impact is exaggerated for smaller or less concentrated wolf populations, as an alpha wolf that is eliminated from a pack generally must be replaced by a mature wolf from another pack to allow the pack to persist and produce pups the following year.   The chances of reproduction and pup survival after the loss of one or both alpha wolves are greatly influenced by pack size and distribution.

33.     The process of traveling to establish a new territory is called dispersal.   Dispersal is essential to the viability and recovery of the gray wolf.   Dispersing wolves find mates in disparate geographic areas, which helps maintain the genetic diversity of the species.   Genetic diversity is essential to the long-term survival of wolves.   Further, dispersing wolves are crucial to wolf recovery because they are needed to recolonize areas where wolves were previously eradicated.

*Ecological Significance of Wolves*

34.     The ecological benefits of gray wolves are well-documented in the scientific literature.  Numerous studies have shown that the loss of an apex predator species, like the wolf, has ripple effects throughout the ecosystem that may lead to reduced biodiversity.  As such, the presence of wolves helps to preserve functioning ecosystems, thereby helping to effectuate the ESA's broader goal of preserving functioning ecosystems.  *See* 16 U.S.C. § 1531(b).

35.     For example, the elimination of the wolf throughout much of its historic range contributed to an explosion in numbers of coyotes across the United States.  Coyotes now occupy most of the wolf's historic range, and the invasion of coyotes has contributed to the decline of other species, such as the swift fox.

36.     Wolf recovery has helped restore natural predator-prey dynamics.  These effects have been seen in the ecosystem of Yellowstone National Park following the reintroduction of the wolf in the mid-1990s.  For example, the wolves changed the grazing behavior of elk and other ungulates along waterways which permitted tree species to recover from over-browsing. The vegetation recovery improved biodiversity by creating shelter and habitat for beavers and songbirds, and by increasing potential trout habitat.

37.     Similarly, beneficial effects have been seen in the Great Lakes region, where the migration of wolves to Michigan's Isle Royale National Park corrected an overpopulation of moose that was damaging the Park's plant communities.

38.     Wolves also benefit scavenger species such as bears, badgers, and eagles, which are provided with a reliable food source year-round from the "leftovers" of wolf kills.

### *The Listing of the Gray Wolf*

39.     Gray wolves were once abundant across North America, with more than 350,000 individuals inhabiting the American West.   However, with the European Settlers came the widespread persecution of wolves.   According to the FWS, "wolves were hunted and killed with more   passion   and   zeal   than   any   other   animal   in   U.S.   history."   FWS,   *Gray Wolf*,   http://digitalmedia.fws.gov/cdm/ref/collection/document/id/111   (July   1998).     Habitat destruction and government bounties that encouraged the poisoning, trapping, and hunting of wolves resulted in their extirpation from more than 95 percent of their range in the lower-48 states.  68 Fed. Reg. 15,804, 15,805 (Apr. 1, 2003).  In Montana, Idaho, Wyoming, and adjacent southwestern Canada, wolves were exterminated by the 1930s.  77 Fed. Reg. at 55,535.

40.     Because of its imperiled status, the gray wolf was one of the first species to be listed under the Endangered Species Preservation Act of 1966, the precursor to the ESA.  *See* 32 Fed. Reg. 4,001 (Mar. 11, 1967) (listing the gray wolf).  But these protections were limited and it was the 1973 passage of the ESA that introduced the first serious protection for the wolf.

41.     Following listing under the ESA, the FWS developed a recovery plan for gray wolves in the Northern Rocky Mountains in 1980, which it revised in 1987.  The 1987 recovery plan established a recovery goal of 10 breeding pairs in each of the three identified recovery areas – northwest Montana central Idaho, and the Greater Yellowstone Area ("GYA") – for a minimum of three successive years.  At the time this minimum recovery goal was set, it was unclear whether wolves would ever regain a foothold in the region.  This recovery goal has not been updated in the last 25 years.

42.     In the FWS's 1994 environmental impact statement ("EIS") on the reintroduction of wolves to Yellowstone National Park, the FWS reiterated its 1987 recovery goal, specifying

that the recovery criteria requires a minimum of "thirty or more breeding pair comprising some 300+ wolves in a metapopulation. . . with genetic exchange between subpopulations."  74 Fed. Reg. 15,123, 15,130-31 (Apr. 2, 2009) (citing the 1994 EIS).  It defined "metapopulation" as "a population that exists as partially isolated sets of subpopulations" and "breeding pair" as "an adult male and an adult female wolf that have produced at least 2 pups that survived until December 31 of the year of their birth, during the previous breeding season."  *Id*.

43.     The FWS has stated repeatedly that wolves would not be recovered until genetic connectivity among wolves in the three core recovery areas was achieved.  *See e.g.*, 77 Fed. Reg. at 55,537; 74 Fed. Reg. at 15,131; *Defenders of Wildlife v. Hall*, 565 F.Supp.2d 1160, 1169-70 (D.Mont. 2008); FWS, Final EIS Studying the Reintroduction to Yellowstone National Park and Central Idaho, Appx. 9 at 42 (1994) ("[i]t is fairly clear that ten breeding pairs in isolation will not comprise a 'viable' population").

44.     In 1995, the FWS reintroduced 66 gray wolves into Yellowstone National Park and central Idaho.  *See* 72 Fed. Reg. 36,942, 36,943 (July 6, 2007) (describing reintroduction). Since that reintroduction, the Northern Rockies wolf population has grown to approximately 1,774 as of the end of 2011 – the last official count.  77 Fed. Reg. at 55,539.

45.     While gray wolves have begun progressing towards recovery in the region, the wolf population is far below the levels the best available science indicates the population needs to meet in order to ensure recovery.  The best available science requires that, at minimum, wolf population recovery goals be set utilizing what is known as the 50/500 rule.  Under this rule, 50 breeding individuals are needed for a population to be ecologically viable for the short-term and 500 breeding individuals are needed for a population to be evolutionarily viable for the long-term – *i.e.*, 100 years.  Because the breeding population is only likely to be 10 to 20 percent of the

total population, the 50/500 rule translates to a total population of approximately 2,500 to 5,000 individuals for long-term viability. Moreover, wolves have not achieved adequate genetic connectivity. Indeed, wolves in the GYA remain the most genetically isolated recovery segment in the Northern Rockies.

### The FWS's Prior Attempts to Delist Wolves

46.     In 2000, despite the fact that gray wolf recovery was incomplete, the FWS began an intensive campaign to delist the wolf throughout the country. It started when the agency published a proposed rule that sought to create three distinct population segments ("DPSs") of gray wolves – an Eastern, Western, and Southwestern DPS – and to reclassify, or "downlist", the gray wolf from "endangered" to "threatened" in the Eastern and Western DPS, and to delist the gray wolf entirely in many regions that historically supported wolf populations. 65 Fed. Reg. 43,450 (July 13, 2000). The FWS finalized this proposal in April 2003. 68 Fed. Reg. 15,804 (Apr. 1, 2003).

47.     Two separate coalitions of animal protection and conservation organizations, including Plaintiff The HSUS, challenged the 2003 rule. In 2005, two federal district courts struck down the rule as violative of the ESA. *Defenders of Wildlife v. U.S. Dep't of Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005); *National Wildlife Federation v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005). Following these decisions, the gray wolf retained its listing status as endangered throughout the contiguous United States, except in Minnesota where it remained listed as a threatened species.

48.     The FWS, undeterred by these judicial repudiations, published a proposed rule announcing its intent to strip wolves of their ESA protections in Montana, Idaho, and Wyoming, and parts of Washington, Oregon, and Utah – the Northern Rocky Mountain DPS. 72 Fed. Reg.

6,106 (Feb. 8, 2007).  The proposed rule, however, noted that the area in northwestern Wyoming outside national parks would only be delisted in the final rule if Wyoming adopted adequate regulatory mechanisms.  *Id.*  Following the proposed rule, Wyoming adopted a wolf management plan which the FWS found to be adequate, and the FWS published a final rule delisting wolves throughout the Northern Rocky mountain DPS in 2008.  73 Fed. Reg. 10,514 (Feb. 27, 2008) ("2008 delisting rule").

49.     Once again, numerous animal protection and conservation organizations, including Plaintiff The HSUS, challenged the delisting in federal court.  *Defenders of Wildlife v. Hall*, 565 F.Supp.2d 1160 (D.Mont. 2008).  The Plaintiffs moved for a preliminary injunction, which the court granted on July 18, 2008, thereby reinstating federal protections for wolves in the Northern Rockies.  *Id.* at 1178.  In issuing the preliminary injunction, the court found that the plaintiffs had a substantial likelihood of success on the merits of their claim that the FWS's decision to delist the gray wolf in the Northern Rockies was arbitrary and capricious because there was no evidence of genetic exchange between subpopulations, and because Wyoming's regulatory mechanisms under its 2007 plan were inadequate – the plan failed to commit the state to manage for at least 15 breeding pairs and declared wolves as "predatory animals" in approximately 90 percent of the state, where they would be subject to unrestrained and unregulated human-caused mortality.  *Id.* at 1172-73.  The court felt that these particular aspects of Wyoming's plan showed that the "continued existence of the wolf in Wyoming and outside National Parks Units is in serious jeopardy."  *Id*. at 1175.  The court also noted that Wyoming's depredation control law was "significantly more expansive" than the federal regulations and that, as a result, it was "unclear whether a viable wolf population can be sustained under the law."  *Id*. at 1176.  In fact, as the court pointed out, the 2007 Wyoming plan suffered from "the same

deficiencies" that led the FWS to reject a previous iteration of that plan and the agency's decision to delist wolves in light of these same deficiencies was an unexplained "flip-flop[ ]" that would not be entitled to deference.  *Id*. at 1163.

50.      In response to the ruling, instead of continuing to defend its 2008 delisting rule, the FWS moved the court for a voluntary remand and vacatur.  The court granted the FWS's motion on October 14, 2008, vacating and remanding the 2008 delisting rule to the FWS, thereby restoring the Northern Rocky Mountain gray wolf DPS's endangered listing under the ESA.

51.      On October 28, 2008, just two weeks after the court issued its order vacating and remanding the 2008 rule, the FWS announced the reopening of the comment period on its proposed rule to delist the Northern Rocky Mountain gray wolf DPS – the very same rule that led to the lawsuit, preliminary injunction against implementation of the rule, and the court's remand and vacatur order.  73 Fed. Reg. 63,926 (Oct. 28, 2008).  The proposed rule offered no new information as to why delisting was appropriate, but did reference an unsigned, draft memorandum of understanding between the states and the FWS that contained vague representations regarding state management strategies to facilitate genetic exchange following delisting.  *Id*. at 63,930.  The FWS issued a new final rule on April 2, 2009 that once again designated a Northern Rocky Mountain gray wolf DPS and delisted wolves throughout the DPS, except for wolves in Wyoming.  74 Fed. Reg. 15,123 (Apr. 2, 2009) ("2009 delisting rule").

52.      In its 2009 delisting rule, the FWS decided to leave wolves in Wyoming on the federal list of endangered species because it determined that the Wyoming portion of the range "represents a significant portion of range where the species remains in danger of extinction because of inadequate regulatory mechanisms."  74 Fed. Reg. at 15,147.  According to the FWS, those inadequate regulatory mechanisms included the fact that "State law allows no regulation of

wolf mortality in over 88 percent of the State, including many areas likely to be used by dispersing wolves" and that extent of this area the "certainly limits most opportunity for genetic and demographic connectivity, a condition that will assist in sustaining wolf recovery in the GYA." *Id*. at 15,149.   In addition, the FWS noted that in order for delisting of wolves in Wyoming to become appropriate, Wyoming would have to manage for at least 15 breeding pairs and at least 150 wolves in mid-winter, and at least 7 breeding pairs and 70 wolves outside of national parks, so that wolves would be adequately protected from "excessive human-caused mortality" and from falling below recovery levels.   *Id*. at 15,142.   This was particularly important in light of the fact that it the past, Wyoming has, "almost without exception encouraged wolf take to drive the wolf population down to minimum recovery levels." *Id*. at 15,149.

53.   Plaintiff The HSUS and other animal protection and conservation organizations challenged the partial delisting . *Defenders of Wildlife v. Salazar*, 729 F.Supp.2d 1207 (D.Mont. 2010).   The U.S. District Court for the District of Montana ruled in favor of the Plaintiffs in August of 2010, vacating and setting aside the 2009 delisting rule. *Id*. at 1229.   In doing so, the court found that the FWS's decision to delist only part of the Northern Rocky Mountain DPS violated the plain meaning of the ESA because "[t]he words used in the ESA make clear that 'species' excludes distinctions below that of a DPS. . . and that this definition of 'species' applies not only when defining a species, but to all sections of the ESA." *Id*. at 1221.   As such, "[e]ven if the Service's solution is pragmatic, or even practical, it is at its heart a political solution that does not comply with the ESA. The northern Rocky Mountain DPS must be listed, or delisted, as a distinct population and protected accordingly." *Id*. at 1228.

54.     After the decision, the FWS published a final rule reinstating federal protections for wolves in the Northern Rocky Mountains on October 26, 2010.  75 Fed. Reg. 65,574 (Oct. 26, 2010).

55.     Following the October 2010 relisting, Congress passed H.R. 1473, the Department of Defense and Full-Year Continuing Appropriations Act of 2011.  This Act contained a "rider" that required the FWS to reissue the 2009 delisting rule.  P.L. 112-10 § 1713, 125 Stat. 38 (2011).  The FWS complied and on May 2011, Wyoming became the only state in the Northern Rocky Mountains where wolves were still protected by the ESA.

### The Current Wyoming Delisting Rule

56.     Soon after enactment of the Congressional rider, Secretary Salazar met with the Wyoming governor to discuss a wolf delisting plan for the state, including the substance of Wyoming's wolf management plan.  The Wyoming Fish and Wildlife Commission adopted a wolf management plan subsequent to those discussions in September 2011.  On October 5, 2011, the FWS issued a proposed rule to delist wolves in Wyoming based on that plan, provided conforming changes to state law were enacted.  76 Fed. Reg. 61,782 (Oct. 5, 2011).  Wyoming adopted some statutory and regulatory changes, and the FWS issued a final rule delisting wolves in Wyoming on September 10, 2012.  77 Fed. Reg. 55,530 (Sept. 10, 2012) ("2012 delisting rule").

57.     The FWS issued its 2012 delisting rule despite the fact that the Wyoming wolf management scheme – which consists of state statutes, regulations, and an administrative management plan – contains many of the same inadequacies that led to its repeated rejection of prior wolf management plans for the state and is not meaningfully different from those previous plans.

58.     Indeed, prior to the promulgation of the proposed rule, the FWS commissioned a peer review of Wyoming's 2011 wolf management plan.  The five-scientist panel found the plan lacking, stating that "the Plan, as written, does not do an adequate job of explaining how wolf populations will be maintained, and how recovery will be maintained."  Final Wyoming Gray Wolf Peer Review Summary Report, at 13 (Dec. 2011).  Following this review, and publication of the proposed rule in October 2011, Wyoming released an addendum to its 2011 wolf management plan and the FWS requested a peer review of the 2012 Addendum from the panel.  The panel continued to question the sufficiency of the plan, recognizing that the Addendum merely regurgitated particular aspects of its 2011 plan, made only superficial clarifications, and failed to address the scientific criticisms of the original peer review.  Supplemental Wyoming Gray Wolf Peer Review Summary Report (May 2012).  The FWS chose to delist the wolf in Wyoming without requiring Wyoming to fix any of the problems the panel had identified, finding that Wyoming had adequate regulatory mechanisms in place.  This conclusion is dubious at best.

59.     Pursuant to Wyoming's plan, wolves are managed under a dual classification system, where wolves are managed as trophy game animals in an area in northwestern Wyoming, including Yellowstone and Grand Teton National Parks, that constitutes just over 15 percent of the state (the Wolf Trophy Game Management Area ("WTGMA")) and as "predatory" everywhere else – approximately 85 percent of the state.  The WTGMA is expanded southward by 1.3 percent from October 15 to March 1 each year (the "flex zone").  While inside the WTGMA, wolves will be subjected to regulated hunting and killing.  Outside the WTGMA, however, wolves will be subjected to unregulated and unrestricted hunting and other human-caused mortality.

60.    In examining this dual classification system, FWS stated that "few of the wolf packs in the predator portions of Wyoming would persist to the end of 2012" and that "some of the current lone wolves in the predator area would [also] be killed." 77 Fed. Reg. at 25,666; *see also* 76 Fed. Reg. at 61,807 ("wolves are unlikely to survive in portions of Wyoming where they are regulated as predatory animals").  The FWS found this to be an adequate regulatory mechanism, even though it previously stated it would require the statewide classification of wolves as trophy animals (as is the case with bears and cougars in the state) and that the FWS previously stated all of Wyoming comprised a significant portion of the range of the Northern Rocky Mountain DPS.

61.    Moreover, instead of requiring Wyoming to manage for 15 breeding pairs and 150 wolves to provide a sufficient buffer above minimum recovery numbers, as it required of Montana and Idaho, and previously required of Wyoming, the FWS Delisting Rule requires only that the state manage for 10 breeding pairs and 100 wolves outside of Yellowstone National Park and the Wind River Reservation.  In other words, Wyoming is permitted to eliminate all but 100 wolves outside these areas, and rely only on wolves in Yellowstone for its buffer.  However, Wyoming is not required to increase its minimum population if the wolf population in Yellowstone drops below a certain threshold, as the FWS had also previously required of Wyoming, nor is Wyoming required to provide a buffer around Yellowstone where wolves cannot be killed so that state management does not diminish the Yellowstone population.  This is particularly troubling, considering that many of the Yellowstone packs leave the park and thus could be shot or otherwise killed under Wyoming's hostile management plan, or in neighboring Montana and Idaho.  Indeed, seven radio collared-Yellowstone wolves have already been killed so far this year, several in Wyoming, though the number is likely much higher given that these

seven wolves were readily identifiable by their collars.  Genetic connectivity between wolves in Yellowstone, the GYA, and the Northern Rocky Mountain population will also be reduced under the plan.

62.     Compounding these deficiencies is the fact that Wyoming law contains no firm target for or limitation on human-caused mortality.  During its first hunting season, Wyoming officials have stated that they intend to be "conservative" in their approach and plans to aim for a human-caused mortality rate between 22 percent and 35 percent.  However, Wyoming has not made any assurances regarding target mortality rates in future years.  The State's management documents express an intention to achieve an allegedly "sustainable" rate of human-caused mortality between 22 percent and 48 percent.  Several studies, however, placed the sustainable range between 17 percent and 29 percent – only one study placed it at 48 percent, and Wyoming is apparently relying on this outlier that does not represent the best available science in making its management decisions. The plan and addendum also state that Wyoming will engage in "adaptive management" to ensure population objectives are met, but does not adequately explain what this means.

63.     In short, Wyoming's wolf management scheme is really nothing more than an attempt at precipitous population reduction under the guise of wildlife management.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim 1 – Violation of the ESA:
### Failure to Consider Threats throughout the Northern Rocky Mountain DPS

64.     Plaintiffs incorporate herein by reference all of the allegations contained in paragraphs 1–63 above.

65.     Section 4 of the ESA establishes a five-factor test pursuant to which the FWS must "determine whether any species is an endangered species or a threatened species." 16 U.S.C. § 1533(a) (emphasis added); *see also id*. § 1533(c)(2)(B) (the same five factors must be considered when delisting a species).  The statute defines a species to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  *Id*. § 1532(16).  It does not include distinctions below that of a DPS.

66.     Yet, in delisting wolves in Wyoming, the FWS failed to consider the impact that delisting wolves in Wyoming would have on the entire Northern Rocky Mountain wolf population, and failed to consider the threats posed to that population by the inadequate regulatory mechanisms and the resultant high levels of human-caused mortality in Idaho and Montana.  For example, the FWS failed to consider that Montana and Idaho have not made the enforceable commitments to wolf protections upon which the FWS relied in delisting wolves in those states in 2009, such as commitments to maintaining population size and promoting genetic exchange.  In addition, Montana and Idaho recently enacted regulatory changes that are not only hostile to wolves, but will actively reduce wolf populations.  This past season, hunters and trappers killed 379 wolves in Idaho (255 by hunters and 124 by trappers) and hunters killed 166 wolves in Montana.  77 Fed. Reg. at 55,581.  Montana's 2012-2013 hunting regulations eliminate the wolf-kill quota, except for areas around Glacier and Yellowstone National Parks (in contrast to last year's quota of 220 wolves); expand the general season from September 1 to February 28; and allowing trapping for the first time statewide from December 15 through February 28.  MFWP, 2012-2013 Wolf Hunting Seasons, Quotas, and Hunting District Boundaries, at http://fwp.mt.gov/hunting/planahunt/huntingGuides/wolf/default.html.  In Idaho,

recent regulatory changes allow hunting and trapping of wolves until March 31 in the majority of the state; only set a quota in five of the thirteen hunting and trapping zones; and permit individuals to take up to ten wolves, five via trapping and five via hunting.  IDFG, 2012 Gray Wolf Hunting and Trapping Seasons and General Rules, at http://fishandgame.idaho.gov/public/docs/rules/bgWolf.pdf.

67.     Moreover, in 2010, Idaho decided to manage wolves pursuant to its 2002 wolf management plan, which establishes a population objective of only 15 "packs."  Such objective does not meet the FWS's recovery standard that attempts to maintain 15 breeding pairs.  See 77 Fed. Reg. at 55,537 (discussing the importance of "breeding pairs" for wolf recovery and management).  The "breeding pair" criterion is useful because it ensures that the wolf population continues to reproduce.  Not every "pack" contains a breeding pair, and therefore Idaho's law does not ensure that the population standard the FWS has set for it will be met.  Indeed, the FWS previously determined Wyoming's plan insufficient because it planned to manage for 15 packs, rather than 15 breeding pairs.  See 71 Fed. Reg. 43,410, 43,428-30 (Aug. 1, 2006) (stating that Wyoming's regulatory mechanisms were inadequate due to, inter alia, reliance on packs, rather than breeding pairs).

68.     The FWS, however, failed to confront the decrease in wolf dispersal that is likely to result from such increasingly aggressive and hostile state wolf management measures, and failed to evaluate Montana and Idaho's regulatory changes, which further diminish protections for Northern Rocky Mountain gray wolves and threaten their viability, in violation of the ESA. 16 U.S.C. § 1533(a)(1)(D).

69.    The Delisting Rule is thus arbitrary, capricious, an abuse of discretion and not in accordance with the ESA, 16 U.S.C. §1533(a), (b), in violation of the APA, 5 U.S.C. § 706(2), and must be set aside.  *Id*.

### *Claim 2 - Violation of the ESA:*
### *Failure to Analyze Threats throughout a Significant Portion of the Wolf's Range*

70.    Plaintiffs incorporate herein by reference all of the allegations contained in paragraphs 1–69 above.

71.    When analyzing the five factors contained within Section 4 of the ESA to determine whether a species is threatened or endangered, the FWS must analyze the factors "throughout all or a significant portion of [the species'] range."  16 U.S.C. §§ 1533(a); 1532(6), (20).  A species' range includes "major geographical areas in which [a species] is no longer viable but once was."  *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001).  In removing ESA protections from the wolf in Wyoming, however, the FWS failed to analyze threats to the wolf throughout a significant portion of its range, and instead arbitrarily and capriciously limited its "range" analysis to that portion of the Northern Rocky Mountain DPS known to be presently occupied by wolves, *see* 77 Fed. Reg. at 55,576-77, thereby discounting the large unoccupied (and rarely occupied) region where wolves were once viable.

72.    Moreover, in concluding that the Wyoming wolf population is recovered in a "significant portion" of its range, the FWS failed to adequately justify the "insignificance" of the potential habitat lying outside of the occupied portions of Wyoming's core recovery area.  In the delisting rule, the FWS determined that all areas outside the core recovery area are not "significant" because they do not contain suitable wolf habitat.  The FWS reached this conclusion based in part on present and future threats posed by the human-caused mortality of wolves that disperse into these areas, and the development of these areas.  For example, the FWS

found that wolves in the "predator area" – which represents approximately 85 percent of the state – does not constitute a "significant" portion of the range as wolves are unlikely to remain in that area because they will be killed by humans consistent with Wyoming's management plan.  In so doing, the FWS relied on the hostile nature and devastating results of the Wyoming management plan in order to narrow the scope of the area considered in the delisting analysis and thereby justify its approval of the management plan.  The FWS reached this conclusion despite the fact it previously concluded that the entire State of Wyoming constituted a significant portion of the wolf's range.   To ignore a large portion of the wolf's historic range due to preventable, anthropogenic threats is arbitrary, capricious and not in accordance with the ESA.

73.     The Delisting Rule is therefore arbitrary, capricious, an abuse of discretion, and otherwise contrary to the ESA, 16 U.S.C. § 1533(a), (b), in violation of the APA, 5 U.S.C. § 706(2), and must be set aside.

### Claim 3 – Violation of the ESA: Lack of Biological Recovery

74.     Plaintiffs incorporate herein by reference all of the allegations contained in paragraphs 1–73 above.

75.     Under the ESA, decisions to delist a species must be made "solely on the basis of the best scientific and commercial data available," 16 U.S.C. § 1533(b)(1)(A), (c), and specifies that a species can be delisted only if the best available science indicates it is no longer endangered or threatened under any of the five listing factors.  *Id*. § 1533(a), (c); 50 C.F.R. § 424.11(d).  The FWS's decision to delist wolves in Wyoming violates this mandatory duty by utilizing outdated recovery criteria, and because its decision fails to ensure genetic connectivity.  For these same reasons, the FWS's conclusion that the Northern Rocky Mountain DPS is not

threatened by its small population size or genetic isolation is arbitrary and capricious and not in accordance with the ESA.

76.     The FWS's Delisting Rule states its belief that "[a]lthough population decreases are expected in Idaho, Montana, and Wyoming, we expect that these reductions will be carefully managed so that populations are maintained well above recovery levels (perhaps around 1,000 wolves will be maintained across the NRM DPS long term)."  77 Fed. Reg. at 55,552-53. However, the FWS did not give any explanation for its hopeful expectation that 1,000 wolves will be maintained, and no state management measures ensure this population level.  In fact, as described above, the relevant state management schemes – those in Montana, Idaho, and Wyoming – all seek to actively reduce wolf numbers.

77.     In addition, the FWS's conclusion that wolves can maintain high levels of human-caused mortality is incongruous with its own statement that "[w]olves are unlike coyotes, in that wolf behavior and reproductive biology have resulted in wolves historically being extirpated in the face of extensive human-caused mortality," 77 Fed. Reg. at 55,586, and the fact that the best available science indicates that wolf mortality is highly additive – mortality in addition to that which would otherwise naturally occur.

78.     Moreover, the FWS's repeated reference to maintaining 1,000 wolves is a tacit admission that its own decades-old recovery goals for wolves in the region – 300+ wolves in 30 breeding pairs – are insufficient.  Indeed, the recovery goals are not based on the best available science.  Under the internationally accepted International Union for Conservation of Nature's "Red List Criteria" (which the FWS has previously relied on as persuasive authority when making ESA listing decisions, but disregarded without explanation here), a species must be listed as "vulnerable" when its population falls below 1,000 "mature" individuals.  IUCN, Red List:

Categories        and        Criteria,        version        3.1        (2001),        *available        at*
http://www.iucnredlist.org/static/categories_criteria_3_1.  With respect to wolves, scientists have
calculated that a minimum population of 2,000 to 5,000 (including both mature and immature
animals) is required to ensure long-term viability.  Indeed, the FWS itself requires 1,251–1,400
wolves for a recovered population in Minnesota and the FWS's Post-Delisting Monitoring Plan
for wolves in the Western Great Lakes identifies a trigger for consideration of relisting if the
Minnesota winter wolf population reaches "1500 or fewer wolves."  *See* FWS, Post-Delisting
Monitoring Plan for Western Great Lakes Distinct Population Segment of the Gray Wolf (Feb.
2008).

      79.    Wolves also remain threatened by a lack of genetic connectivity.   A basic
concept of the recovery plan for the Northern Rocky Mountain gray wolf is that the three core
recovery areas must form a "metapopulation. . . with genetic exchange between subpopulations."
77 Fed. Reg. at 55,543; *see also* FWS, Final EIS Studying the Reintroduction to Yellowstone
National Park and Central Idaho, Appx. 9, at 42 ("[t]he importance of movement of individuals
between subpopulations cannot be overemphasized.").   While there is incidental evidence of
genetic connectivity between the three subpopulations, the GYA subpopulation continues to be
the most isolated of the three subpopulations.  *Id.* at 55,564–65, 93.   Moreover, the *only*
documented genetic connectivity involving this subpopulation occurred east of Yellowstone
National Park, during a time of population growth, within the area Wyoming has designated as
the WTGMA.   Accordingly, hunting within this area would significantly compromise the genetic
connectivity of the GYA subpopulation with the rest of the Northern Rocky Mountain
population.

80.     Indeed, genetic connectivity among the Northern Rocky Mountain's three wolf subpopulations is almost certain to decline following the delisting of wolves in Wyoming.  By the FWS's own admission, the number of wolves who successfully disperse in a population subjected to increased mortality via hunting and lethal control measures is expected to decrease – "after delisting the population will no longer be growing, the population will likely go through a period reduction before leveling off, and management will likely result in higher mortality rates for both dispersers and resident wolves."  77 Fed. Reg. at 55,593–94.  As such, the FWS's reliance on past data to determine that wolves are not and will not be threatened by a lack of genetic connectivity is arbitrary and capricious, particularly in light of the FWS's own admission in the proposed rule that "past dispersal data is unlikely to be reflective of future effective migration rates."  76 Fed. Reg. at 61,814.

81.     One of the reasons the FWS rejected prior Wyoming wolf management schemes was its concern that the dual classification system – and the failure to manage wolves as a trophy animal across the state in particular – would not allow for adequate dispersal and genetic connectivity.  The superficial changes to Wyoming's current scheme cannot serve as adequate justifications for the FWS's about-face.   Indeed, while Wyoming regulations state the commitment of the Wyoming Fish and Game Department ("WGFD") to "managing gray wolves in Wyoming to ensure genetic diversity and connectivity issues do not threaten the population… by encouraging effective migrants into the population," Wyo. Admin. Code Game Hunt, ch. 21 §§ 4(a)(2), 5(a), the regulations contain no specifics or mechanisms by which such objectives will be achieved.

82.     Moreover, the FWS failed to adequately consider the effects of future hunting in the John D. Rockefeller, Jr. Memorial Parkway ("the Parkway").  The Parkway is the 24,000-

acre connection between Yellowstone National Park and Grand Teton National Park, and is a crucial connection north and south between the two Parks as well as east to west between the GYA and Central Idaho and Northwest Montana.  Accordingly, the Parkway serves a critical role for providing for genetic connectivity in the area.  As the FWS acknowledged in the Delisting Rule, while "Wyoming's hunting regulations are clear that gray wolf hunting would not occur in the Parkway during the 2012 season. . . nothing in Wyoming's regulations or Wyoming's wolf management plan would preclude wolves  from being hunted in the Parkway in subsequent years."  77 Fed. Reg. at 55,560.  This is particularly true considering that the Parkway's enabling legislation mandates it be managed for hunting, Pub. Law 92-404, 86 Stat. 619-620 (1972).  The FWS's Delisting Rule effectively ignores this possibility, claiming it is unlikely hunting would occur in this area, and that that even if it did, "it would likely be very limited" and that it "would be unlikely to noticeably affect wolf gene flow or connectivity" with no support for such statements.  *Id.*  The FWS's failure to adequately explain its dismissal of such a possibility and its attendant effects is arbitrary and capricious.

83.     Finally, the FWS's reliance on the potential for human-assisted genetic dispersal to delist wolves in Wyoming, *see e.g.*, 77 Fed. Reg. at 55,537, is arbitrary, capricious and contrary to the purposes of the ESA.  While future translocation may be an appropriate tool for promoting recovery of an endangered population, such action is speculative at best, and cannot be relied upon to delist a species. *See* 16 U.S.C. § 1531(b) (stating the ESA's goal of seeking "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."); *id*. § 1532(3) (defining "conserve" as "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened

species to the point at which the measures provided pursuant to [the ESA] are no longer necessary. Such methods include...transplantation...").

84.     The Delisting Rule is thus arbitrary, capricious, an abuse of discretion, not based on the best available science, and is otherwise contrary to the ESA, 16 U.S.C. § 1533(a), (b), in violation of the APA, 5 U.S.C § 706(2), and must be set aside.

***Claim 4 – Violation of the ESA:***
***Inadequacy of Existing Regulatory Mechanisms***

85.     Plaintiffs incorporate herein by reference all of the allegations contained in paragraphs 1–84 above.

86.     Under the ESA, a species has not recovered, and cannot be delisted, "until the threats analyzed under Section 4(a)(1) of the Act have been removed."  51 Fed. Reg. at 19,935. Because a species can be listed solely on the basis of "the inadequacy of existing regulatory mechanisms," 16 U.S.C. § 1533(a)(1)(D), a species cannot be delisted until adequate regulatory measures exist to protect the species and ensure its long-term survival once federal protections are removed.  The FWS's determination that the wolves in Wyoming are not endangered or threatened by inadequate state regulatory mechanisms is arbitrary, capricious, contrary to the ESA and not based on the best available science.  *Id.* § 1533(a)(1)(D), (b); 77 Fed. Reg. at 55,588-91.

87.     First, Wyoming law fails to ensure the wolf population does not drop below 100 wolves or 10 breeding pairs.  For example, Wyoming's wolf management scheme does not contain a sufficient buffer.  As the FWS has stated, because "the recovery goal represents the minimum number of breeding pairs and individual wolves needed to achieve and maintain recovery," it has required states to manage for a sufficient buffer above that minimum goal.  77 Fed. Reg. at 55,538.  In fact, the FWS rejected previous iterations of Wyoming's wolf

management plan because the plans failed to clearly commit to managing for at least 15 wolf packs in Wyoming.  While the 2012 addendum and the 2011 plan assert that Wyoming will manage for a sufficient buffer above the 10/100 recovery criteria, this specific management requirement is contradictory to existing statutory language indicating that the state has committed to ensuring only 10 breeding pairs and 100 wolves.  *See* Wyo. Stat. § 23-1-304(a); Wyo. Admin. Code Game Hunt, ch. 21, § 4(a).  Indeed, in the peer review of the 2011 management plan, the panel found that it "may indeed be that it is not in the State's interest to manage down to the absolute minimum population; however that is what is stated in the Plan, and it is not reasonable to simply assume that there will be consistent and longterm commitment to managing for levels above that target."  Final Wyoming Gray Wolf Peer Review Summary Report, at 13.

88.    Second, the Wyoming wolf management scheme allows for unreasonably high levels of human-caused mortality and provides for the unregulated and unrestricted killing of wolves in the vast majority of the state.  Under Wyoming's dual classification system, wolves are managed as trophy game animals the WTGMA and as predatory animals everywhere else – in about 85 percent of the state.  *See* Wyo. Stat. § 23-1-101(a)(viii)(B), (xii)(B).  Within the WTGMA, hunting of wolves will be regulated by licensure requirements, hunting seasons, and annual quotas.  Wyo. Stat. §§ 23-1-302; 304(a).  Outside the WTGMA, however, wolves will be subject to unregulated and unrestricted hunting and other human-caused mortality.  *Id*.; *see also* 77 Fed. Reg. at 55,586 ("in the predator area wolves will experience *unlimited human-caused mortality*") (emphasis added).  The designation allows wolves to be killed by a wide variety of aggressive means, including traps and snares, as well as from aircrafts, vehicles, and snowmobiles.  Wyo. Stat. §§ 23-2-303 (d), (e); 23-3-306(a).  By the FWS's own admission, it

expects "that wolf packs in the predator area of Wyoming *will not persist*."  77 Fed. Reg. at 55,586 (emphasis added).  Indeed, the WGFD does not even have the authority to impose quotas, temporary closures, or other restrictions on the taking of wolves in these areas.  *See* Wyo. Stat. §§ 23-1-302(a)(1).

89.    Third, wolves in the trophy game area will also be subjected to a significant amount of human-caused mortality.  For example, in the trophy game area, Wyoming law *requires* the WGFD to issue lethal take permits to livestock or landowners upon discovery that a wolf has harassed, injured, or killed livestock or domestic animals, provided the removals authorized by such permits could not reduce the numbers of gray wolves below 10 breeding pairs or a total of 100 individual gray wolves within the state outside Yellowstone National Park and the Wind River Indian Reservation, with no buffer above those criteria and no discretion to the agency to not issue permits if the population is approaching those numbers.  Wyo. Stat. § 23-1-304(n).  Moreover, the regulations implementing the statute require the issuance of lethal take permits if requested by an owner of property any time "a gray wolf or wolves *are occupying* a chronic wolf predation area."  Wyo. Admin. Code Game Hunt, ch. 21, § 6(b) (emphasis added). In other words, the WGFD is now required to issue a lethal take permit based on the mere presence of wolves in a particular area, regardless of whether the wolves have killed or injured livestock or domestic animals.  In the FWS's proposed rule, it noted that this program "could become a significant source of mortality if [it] delists the wolf in Wyoming."  77 Fed. Reg. at 55,666.  The FWS's determination that numerous safeguards are in place to limit the potential impacts to the population, *id.*; 77 Fed. Reg. at 55,577, ignores the fact that there is no limit on the number of permits that can be issued.

90.    Fourth, Wyoming law allows for unpermitted and unregulated take of wolves throughout the state when they are "doing damage to private property," including attacking or threatening dogs.  Wyo. Stat. § 23-3-115(c).  In contrast to the FWS's federal management rule, 50 C.F.R. § 17.84(n)(4)(xiii) (2008), and Montana's wolf management regulations, Mont. Admin. R. 12.9.1305 (2012), Wyoming law does not contain any exception for situations in which wolves are intentionally baited into attacking livestock or dogs.  As such, Wyoming's rule might actually promote wolf killing.  The FWS's assumption that baiting would not become widespread practice because it is time consuming and individuals would be more likely to seek a lethal take permit, 77 Fed. Reg. at 55,561, ignores the fact that this statutory provision applies regardless of the number of wolves in the state, *see* Wyo. Stat. § 23-3-115, whereas issuance of lethal take permits should cease if the population drops below 100 individuals or 10 breeding pairs outside Yellowstone and the Wind River Reservation.  These inadequacies are exacerbated by the fact that Wyoming law contains no firm target for or limitation on human-caused mortality or no legally enforceable commitment to manage for a buffer above minimum recovery goals.

91.    In the Delisting Rule, the FWS concluded that this wolf management scheme served as an adequate regulatory mechanism, in part because "the ability of the hunter community to harvest wolves" will increase social tolerance of wolves, 77 Fed. Reg. at 55,569, as "hunters start to see wolves as a trophy animal with value."  *Id.* at 55,592.  The FWS, however, failed to support this conclusion with any scientific data.  Moreover, this conclusion is incongruous with Wyoming's management scheme that treats wolves as "predatory animals" that can be shot on sight in the vast majority of the state.

92.     The Delisting Rule is therefore arbitrary, capricious, an abuse of discretion and otherwise contrary to the ESA, 16 U.S.C. § 1533(a), (b), in violation of the APA, 5 U.S.C. § 706(2), and must be set aside.

### Claim 5 – Violation of the ESA:
### Reliance on Non-Regulatory Mechanisms

93.     Plaintiffs incorporate herein by reference all of the allegations contained in paragraphs 1–92 above.

94.     In analyzing whether a species is endangered or threatened, the FWS must base its determination on the five factors contained within Section 4(a)(1), including "the inadequacy of existing *regulatory* mechanisms."  16 U.S.C. § 1533(a)(1)(D) (emphasis added).  However, in its delisting decision the FWS arbitrarily and capriciously relied on non-regulatory mechanisms, such as "commitments" made in guidance documents, in determining the adequacy of existing regulatory mechanisms.  In fact, many of the non-binding representations on which the FWS relied are in conflict with existing Wyoming law.

95.     For example, the FWS found that Wyoming has committed to "maintain a buffer above these minimum [population goal] levels, in order to provide that the minimum targets are not compromised" and that wolves in Yellowstone will provide even more of a buffer.  77 Fed. Reg. at 55,553.  In support of this conclusion, the FWS cites only the administrative wolf management plan and addendum.  *Id.*  However, existing statutory and regulatory language in Wyoming only requires it to manage for 100 wolves and 10 breeding pairs outside Yellowstone and the Wind River Reservation.  The concept of a population buffer above minimum recovery levels does not appear in Wyoming law.  *See id.* at 55,556 (the FWS's admission that "it decided against requiring Wyoming to provide a specific numeric buffer above these minimum management targets").  Moreover, Wyoming cannot rely on wolves in Yellowstone National

Park or the Wind River Reservation to help reach its buffer – these are not state lands and the state has no authority to manage wolves in those areas.

96.     The Delisting Rule is therefore arbitrary, capricious and not based upon the best available scientific information, in violation of the ESA, 16 U.S.C. § 1533(a), (b), and the APA, 5 U.S.C. § 706(2), and must be set aside.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order:

1.  Declaring that the FWS has violated the ESA and its implementing regulations, as well as the APA, in removing wolves in the State of Wyoming from the federal list of threatened and endangered species;

2.  Setting aside the FWS's Delisting Rule and reinstating the FWS's prior rule affording ESA protections for gray wolves in the State of Wyoming;

3.  Awarding Plaintiffs their reasonable attorneys' fees and costs for this action; and

4.  Granting Plaintiffs such other and further relief as may be just and proper.

Respectfully submitted this 7th day of December, 2012,

_____

Ralph E. Henry
D.C. Bar No. 982586
The Humane Society
of the United States
2100 L Street, N.W.
Washington, DC 20037
(202) 676-2324
rhenry@humanesociety.org
*Attorney for Plaintiffs*